**INSURANCE COMPANY OF NORTH AMERICA, Plaintiff-Appellant,**

v.

**George L. HOYT, Defendant-Appellee.**

**No. 17380.**

United States Court of Appeals
Seventh Circuit.

Dec. 9, 1969.

Michel A. Coccia, Francis D. Morrissey, Thomas F. Tobin, John W. Dondanville, Baker & McKenzie, Chicago, Ill., for plaintiff-appellant.

Frederic O. Floberg, Chicago, Ill., for defendant-appellee. Ross, Hardies, O'Keefe, Babcock, McDugald & Parsons, Robert W. Bartlett, Chicago, Ill., of counsel.

Before KNOCH, Senior Circuit Judge, KILEY and CUMMINGS, Circuit Judges.

KILEY, Circuit Judge.

Plaintiff insurance company (Company) appeals from a judgment against it, after trial without a jury, in its suit to enforce indemnity against defendant Hoyt. We reverse.

In 1962 Hoyt was major stockholder and operating officer of Corydon Travel Bureau. At that time Corydon contracted for the services of Air Traffic Conference of America (Conference), an association of all domestic airlines. The Conference undertook services consisting of issuance to Corydon, among many other agencies, of airline ticket stock from which the agencies could write, and issue, airline tickets to patrons. In turn, Corydon and the other agencies assumed the contractual obligation to reimburse the Conference for the cost of the tickets issued. As part of this service scheme, the Conference, to protect itself against loss, required the agencies it served to provide a bond covering reimbursement in case of agency defaults. This bond was issued by the Company.

Late in 1962 Corydon applied to the Company for inclusion, for the calendar year 1963, with approximately a thou-

sand other travel agencies, in the Company's schedule bond. The application was granted, but the Company required an indemnity provision protecting itself, as Corydon's surety,[1] against loss from default in payments to the Conference. In addition, Hoyt was required to effectually guarantee, in an individual indemnity agreement, performance of Corydon's indemnity obligation. In late 1963 Corydon once again applied successfully for coverage for 1964 in the agency schedule bond, and Hoyt again agreed personally to indemnify the surety. No application for an indemnity bond or personal guarantee was sent to Corydon or Hoyt for the calendar year 1965. The Company merely sent Corydon a premium notice which Corydon paid, as it had done in the prior years.

In June of 1965 Corydon defaulted with respect to $71,000 it owed the Conference. The Conference made proof of loss and the Company, as surety, paid out its coverage limit of $50,000. The Company then sued Hoyt as personal guarantor or indemnitor of Corydon and the judgment before us resulted.

The district court heard evidence, made findings of fact, and concluded that Hoyt's personal guarantee was from year to year and had expired before the default, or, in the alternative, that Hoyt had orally cancelled his guarantee prior to Corydon's default.

The court's conclusion that the contract of personal indemnity expired by its terms is based upon the findings that for the years 1963 and 1964 the Company had sent Hoyt an indemnity agreement form but that for calendar year 1965 it had not done so. Corydon did, however, pay the bond premium for 1965. The conclusion implies an inference that the Company was satisfied that Corydon was a reasonable risk and there remained no need for Hoyt's personal indemnity in 1965. The Company relies upon the wording of the Corydon and Hoyt indemnity agreements to establish as a matter of law that Hoyt's indem-

nity was a continuing one, and was in effect when the default occurred.

The Company-Corydon agreement reads in part:

In consideration of the inclusion of the undersigned in the Schedule Bond as aforesaid, the undersigned agrees to perform all the conditions of all agreements entered into with AIR TRAFFIC CONFERENCE OF AMERICA, in its capacity as agent for the several air carriers which are parties to the Air Traffic Conference Agency Resolution, and will fully indemnify and save Surety harmless from and against any and all loss * * * which the Surety shall sustain or incur * * * by reason * * * of the Surety having included the undersigned in the aforesaid Schedule Bond, or any continuation thereof. * * *

Hoyt's individual indemnity obligation provides:

In consideration of the Insurance Company of North America executing the obligation herein applied for and warranting sufficient interest in applicant's affairs and intending to be bound by applicant's obligations, the undersigned jointly and severally hereby agree(s) to indemnify the Surety and join(s) in the foregoing Agreement.

The "foregoing Agreement" refers to Corydon's agreement to perform its obligations to the Conference and to indemnify the surety.

▮ We think the agreements plainly bind both Corydon and Hoyt to continue as indemnitors as long as Corydon was "included * * * in the aforesaid Schedule Bond, or any continuation thereof." Corydon paid the premium for 1965 and was included in the schedule bond. Hoyt's indemnity obligation accordingly remained with the continuing Company suretyship and Corydon's continuing indemnity obligation.

1. The agency and personal indemnity obligations seem to be required of all applicants.

There is no merit therefore in the argument that the personal indemnity had expired by its own terms before the June 1965 loss. The indemnity obligation had no definite term of duration. The agreements ran from year to year upon approved application or, after 1964, upon payment of premium. Corydon paid the premium for the bond coverage for the full year of 1965, and thus the agreements were in effect during that year. The facts here do not justify applying the rule from Mamerow v. National Lead Co., 206 Ill. 626, 69 N.E. 504 (1903), that a continuing guarantee, not limited as to duration and amount, will be construed to be limited to a reasonable time. The evidence here is plain that the indemnity was continuous, but its duration was terminated by the failure to pay in advance annually the premium required. Thus the district court erred in concluding that the personal indemnity had expired.

■ The validity of the finding of the court with respect to the cancellation of the indemnity agreement rests upon the testimony of witnesses. Hoyt argues that the evidence clearly shows he "wanted" his liability as indemnitor terminated. He contends that in April, 1965, he and one Rosenberg had orally agreed to his selling Corydon to Rosenberg; that the agreement was formalized in writing May 3, after he had informed the Company's general agent Wolff of the sale, and that Rosenberg had promised to release Hoyt and personally assume the indemnity obligation; and that Wolff approved the change in liability and sent forms needed to formalize the cancellation. The ensuing events, however, require that we hold as a matter of law that there was no cancellation of Hoyt's liability as indemnitor of the Company's surety obligation before default. The question is not whether Hoyt "wanted" to cancel his indemnity obligation, but rather whether what he actually did had the effect of cancellation. This question is not decided by the fact that Hoyt sold Corydon to Rosenberg; assuming the sale, Hoyt still had to cancel his indemnity obligation.

■ Hoyt had the burden, under Illinois law governing here, of proving oral cancellation of his written indemnity obligation by evidence "clear, positive and above suspicion." Selman v. Geary, 334 Ill. 642, 650, 166 N.E. 455, 458 (1929); Voris v. McIver, 339 Ill. 340, 348, 171 N.E. 263, 266 (1930). The substance of Hoyt's testimony on this question is that when he telephoned agent Wolff in Washington, D. C., he told Wolff he wanted no misunderstanding about the indemnity agreement; that he had a buyer in Rosenberg whom he wished "to assume any liability that may be involved"; that Wolff said he would send the proper forms and "it will all be taken care of"; and that Rosenberg then talked to Wolff confirming Hoyt's statement that he was buying Corydon and that he would take care of any of the details necessary to establish his standing with the Company. Hoyt testified that the forms arrived later and he gave them to Rosenberg. It is conceded that Rosenberg neither executed the application form for inclusion in the schedule bond nor signed an indemnity agreement.

Wolff did not "recall" the conversation with Hoyt, but from his testimony that the above-mentioned forms were sent to Corydon in June, we presume that Hoyt did telephone him. Wolff said that sending the form as he did was standard practice when a change of ownership was taking place; that the proposed buyer was required to make application and sign the indemnity agreement; and that if the Company approved the application the indemnitor was relieved of liability. He also testified that a telephone conversation could not be substituted for formal cancellation under the practice.

We consider it inherently improbable that—because Hoyt wanted no misunderstanding and "wished" Rosenberg to assume the liability—Wolff's statement

that "it will all be taken care of" meant that the Company was thereby cancelling the indemnity. Not only would that meaning do violence to the Company practice, but it would run counter to common sense.

In the first place, we think it must be acknowledged that the Company could not reasonably assume the risk involved in indemnitors cancelling their indemnities unilaterally by telephone where a thousand or so agencies are covered in the schedule bond. It is also clear that Illinois law allows Hoyt no right unilaterally to rescind a contract. 12 Ill. Law & Prac. § 343 (1955). Secondly, we think that it must be conceded that the Company could not reasonably substitute successor indemnitors, who had bought agencies, without first approving an application giving information about buyer's financial standing. It would not be reasonable on the part of the Company to permit Hoyt to cancel his obligation—incurred in behalf of Corydon's interest *vis-à-vis* the Company—while Corydon was still operating.

Hoyt's construction of his telephone conversation is also weakened by the following evidence: that in the May 3, 1965 sales agreement the buyer agreed he would promptly secure a release of Hoyt's liability on the bond; that a June 19, 1965 letter written by Hoyt, after the loss occurred, and received by the Company on June 22, 1965, stated, "I do not assume this personal obligation as guarantor any longer. Please acknowledge my release"; and by testimony of an admission by Hoyt to Oppenheimer, a Company employee, in an interview on July 6, 1965, that Rosenberg was to have met with Hoyt on June 23—but did not—to sign an agreement "to relieve me of the personal bond." Hoyt said he "may have" told Oppenheimer that.

2. The district court judgment does not show whether its conclusion was based on an ultimate finding of fact or was a decision of law. In either event the reversal is required, on the facts before the court, since a fact finding would be clearly erroneous and a decision of law.

We hold, as a matter of law, that Hoyt's indemnity obligation was not cancelled before Corydon's default and was in effect at the time of the event.[2]

We reverse, and remand with directions to the district court to enter judgment for plaintiff Company against defendant Hoyt in the sum of $50,000.